| | | |
|---|---|---|
| KILE INTERNATIONAL TRUCKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:05-0534 |
| | ) | Judge Echols |
| INTERNATIONAL TRUCK AND ENGINE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is Defendant International Truck and Engine Corporation's ("ITEC") "Motion to Dismiss or Stay" (Docket Entry Nos. 8 & 12) to which Plaintiff Kile International Trucks, Inc. ("Kile International") has filed a response in opposition (Docket Entry No. 21) and ITEC has replied (Docket Entry No. 31).

## I.  FACTS

The dealership agreement between Kile International and ITEC has spawned several lawsuits and a claim before the Tennessee Motor Vehicle Commission ("TMVC"). Because of that, ITEC seeks to stay the present case to allow the previously filed lawsuits to run their course. Alternatively, ITEC seeks dismissal of Kile International's present claims for violation of the Automobile Dealer Day in Court Act ("ADDCA"), 15 U.S.C. § 1221 *et seq.*, violation of the Illinois Motor Vehicle Franchise Act ("IMFVA"), and breach of contract. In order to understand ITEC's arguments, it is necessary to recount the litigation in the various fora and their present status.

1

## A. **Present Complaint**

Kile International filed suit in this Court on July 7, 2005. According to its complaint, Kile International (which is owned and/or managed by Phillip L. Kile, Sr. ("Mr. Kile")) is a dealer of International trucks and related parts and services. (Docket Entry No. 1 ¶¶ 7 & 8). ITEC manufactures International trucks and truck engine parts. (Id. ¶ 7).

Kile International has served as an ITEC dealer in Middle Tennessee since 1984. Since at least October, 1987, the relationship between Kile International and ITEC has been governed by a Dealer Sales/Maintenance Agreement ("Dealership Agreement"). (Id. ¶ 7 & Ex. 1).

Over time, the relationship between the parties has deteriorated. Kile International claims that ITEC has been trying to force it out of its dealership position and has asserted pretextual breaches of the dealership agreement, including an alleged failure to maintain adequate dealership facilities and sell a sufficient number of International truck parts. (Id. ¶¶ 8-9). Kile International further claims that in furtherance of its "oppressive scheme," ITEC filed pretextual litigation in Illinois state court, even though ITEC was a licensed manufacturer of motor vehicles under Tennessee law and Kile is a licensed motor vehicle dealer under Tennessee law. (Id. ¶¶ 12-14). ITEC filed the case in Illinois despite the fact that a Tennessee statute, Tennessee Code Annotated § 55-17-115, requires venue in a Tennessee court for resolution of a dispute between a Tennessee manufacturer and

2

Tennessee dealer, and in spite of the fact that the Tennessee Motor Vehicle Commission ("TMVC") issued a warning letter to ITEC about its decision to file suit in an Illinois court. (Id. ¶¶ 15-16). ITEC seeks in excess of $5,000,000 for breach of contract in that case. (Id. ¶ 18).

Kile International claims that the filing of the Illinois suit was an extension of ITEC's prior oppressive conduct. In this regard, it asserts that in 2002 and 2003, when Kile International was purportedly in breach of the dealership agreement, ITEC informed Mr. Kile that if he acquired a new facility and made good faith efforts to perform under the dealership agreement, the disagreement between the parties over alleged breaches would be resolved. Based upon those representations and ITEC's assurance that it would release its option to lease the existing dealership, Mr. Kile and his wife spent millions of dollars, utilizing their own resources and credit, to build a new facility. However, ITEC reneged on its promise to release the option in a timely fashion. (Id. ¶¶ 22-27).

Additionally, Kile International asserts that it has been wrongly excluded from programs offered to other ITEC dealers and that ITEC has offered to sell it products at prices higher than those quoted to other dealers. The oppressive conduct is also alleged to include ITEC's failure to plan and set goals in a collaborative fashion and ITEC's refusal to provide the necessary price support to allow Kile to obtain the market share required by ITEC. (Id. ¶¶ 31-35).

3

Based upon the foregoing and other allegations, Kile International claims that ITEC is liable under the ADDCA which allows a dealer to recover damages as a result of a manufacturer's failure to act in good faith in performing or complying with the terms of a franchise agreement. (Id. ¶¶ 50-61). Kile International also asserts a claim under the IMVFA, 815 ILCS 710.1 *et seq.*, which, among other things, prohibits manufacturers from engaging in fraud and abusive conduct with respect to their dealers. (Id. ¶¶ 62-71). Finally, Kile International claims that ITEC has breached the dealership agreement between the parties in numerous material ways. (Id. ¶¶ 72-77).

Pursuant to the Initial Case Management Order entered on October 5, 2005, discovery is proceeding and scheduled to close on June 19, 2006. (Docket Entry No. 26). The parties have specifically agreed to utilize the discovery obtained in other litigation as if it were originally obtained in this litigation and supplement that discovery if necessary. (Id.).

**B.** **The Illinois Lawsuit**

On June 2, 2004, ITEC filed suit in the DuPage Circuit Court against Kile International in a case styled International Truck and Engine Corp. v. Kile International Trucks, Inc., 2004L000580. Jurisdiction in the Illinois court is alleged to exist because ITEC's principal place of business is in that state and because Kile International has transacted business there by way of regularly attending meetings in Illinois and submitting thousands

4

of warranty claims to ITEC in Illinois. (Docket Entry No. 10 ¶¶ 2-3).

ITEC seeks money damages in excess of $5,000,000 for Kile International's alleged breach of the dealership agreement. Specifically, ITEC claims Kile International breached the dealership agreement by failing and refusing to (1) maintain a dealership of acceptable size and appearance; (2) achieve a reasonable market share of ITEC products in its trade area; (3) promote aggressively ITEC products in its trade area; (4) maintain the required inventory of ITEC products; and (5) maintain an appropriate number of sales persons for the trade area. (<u>Id</u>. ¶ 12). Those breaches allegedly continued even though ITEC notified Kile International of the breaches on several occasions. (<u>Id</u>.).

Kile International moved to dismiss or transfer the Illinois litigation on the grounds that the court lacked in personam jurisdiction over it and that the forum selection clause in the Dealership Agreement required that the litigation be heard in a Tennessee court. That motion was denied by Order dated December 15, 2004. (Docket Entry No. 31, Ex. B). Discovery was scheduled to be concluded in that case by December 1, 2005, although the record is unclear as to whether discovery has in fact been completed. (<u>See</u> Docket Entry No. 24).

**C.  The "Option" Case in this Court**

Mr. Kile and his wife Patricia Kile (collectively "the Kiles") filed an action in Tennessee state court which was removed to this

Court on December 1, 2004. In the Second Amended Complaint, Plaintiffs alleged breach of contract, promissory estoppel, negligence and/or intentional misrepresentation, and violation of the Tennessee Consumer Protection Act ("TCPA") as a result of ITEC's untimely release of the option it held on the property the Kiles had purchased and leased to Kile International for its dealership. (Docket Entry No. 42 in Case No. 3:04-1069).

At the time the Kiles acquired the property, they knew they were acquiring the property subject to an option. (Case No. 3:04-1069, Docket Entry No. 61, Memorandum at 2). Under the terms of the option, International Truck had a period of one hundred twenty days from the termination of the lease between the Kiles and Kile International or the termination of the Dealer Agreement within which to exercise the option. (Id. at 5).

In April 2002, Kile International was informed that its facilities were of insufficient size and did not meet the proper "image" for an International dealership. To cure the alleged defect, the Kiles decided to build a new facility on other property they owned. Intending to lease the new facility to Kile International, the Kiles broke ground for a new dealership in January 2004. (Id. at 3-4).

Mr. Kile made numerous requests to ITEC to release its option on the property. (Id. at 4). He claims that ITEC informed him the option would be released either when the plans for a new facility were complete or when construction began on the new facility. (Id. at 4-5). Nevertheless, the option was not released until November

6

2004, after the facility had been completed, Kile International had moved into the facility, and litigation had commenced. (Id. at 6).

ITEC moved for summary judgment on all of the Kiles' claims. That motion was denied by Order of this Court entered November 9, 2005. (Case No. 3:04-1069; Docket Entry No. 62). That case is scheduled for trial on March 14, 2006.

## D. **The Complaint before the Tennessee Motor Vehicle Commission**

Kile International filed a Complaint against ITEC with the Tennessee Motor Vehicle Commission ("Commission") on July 22, 2004. The Complaint noted that Kile International was a dealer licensed by the Commission and that ITEC was licensed by the Commission as a manufacturer. The Complaint alleged that ITEC's filing of the Illinois lawsuit violated Tennessee Code Annotated § 55-17-115 which provides that the venue for any disputes between Tennessee manufacturers and dealers is to be in Tennessee. It was further alleged that ITEC refused to dismiss the Illinois case even after a demand was made by Kile International that it comply with the statute. (Docket Entry No. 9 at 7).

On October 29, 2004, the Commission issued a "Letter of Warning." (Docket Entry No. 22, Attach. to Ex. A). In that letter, the Commission noted that under Tennessee Code Annotated § 55-17-115 any causes of action between Tennessee motor vehicle manufacturers and dealers are to be litigated in the state of Tennessee. ITEC was instructed that "in the future you must consider this provision in any similar litigation." (Id. at 2).

7

Upon ITEC's receipt of the letter, the matter was dismissed by the Commission. (Id.).

## II.  STANDARDS OF REVIEW

### A.  Motion to Stay

Federal courts have a "'virtually unflagging obligation'" to exercise their jurisdiction. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). Accordingly, "abstention from the exercise of federal jurisdiction is the exception, not the rule," and thus a federal court should only stay actions in "exceptional circumstances." Id. (citation omitted).

### B.  Motion to Dismiss

In evaluating a Complaint under Rule 12(b)(6), the Court must accept as true all of Plaintiff's allegations and resolve all doubts in Plaintiff's favor. See Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489 (6th Cir. 1990). The Court should not dismiss the Complaint unless it appears beyond doubt that Plaintiff cannot prove any set of facts in support of its claims that would entitle it to relief. Id.

## III.  LEGAL ANALYSIS

### A.  Motion to Stay

"In certain 'exceptional' circumstances . . . a federal court may abstain from exercising its subject matter jurisdiction due to the existence of a concurrent state court proceeding, based on consideration of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of the litigation." PaineWebber Inc. v. Cohen, 276 F.3d 197, 206 (6th

8

Cir. 2001)(citation omitted). Such abstention is based upon the doctrine developed by the Supreme Court in <u>Colorado River</u> and its progeny.

"Before the <u>Colorado River</u> doctrine can be applied, the district court must first determine that the concurrent state and federal actions are actually parallel." <u>Romine v. Compuserve Corp.</u>, 160 F.3d 337, 339 (6th Cir. 1998). "[E]xact parallelism" is not required; '[i]t is enough if the two proceedings are substantially similar.'" <u>Id</u>. "The question is not whether the suits are formally symmetrical, but whether there is a 'substantial likelihood' that the foreign litigation 'will dispose of all claims presented in the federal case.'" <u>AAR Intern., Inc. v. Nimelias Enterprises, S.A.</u>, 250 F.3d 510, 518 (7th Cir. 2001).

This Court finds that the present case and the earlier filed cases between Kile International and ITEC are not parallel. While all involve essentially the same parties (or at least parties who share common interests such as the Kiles and Kile International), and all revolve in some way around the relationship between ITEC and Kile International, neither the Illinois state case nor the option case will dispose of Kile's ADDCA claim in this case.

Yet, even if the cases are considered parallel, abstention, in the form of a stay, would not be appropriate. In determining whether to abstain from entertaining a parallel case, a court should consider eight factors. Those factors are:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of

9

> piecemeal litigation; . . . (4) the order in which
> jurisdiction was obtained[;] . . . (5) whether the source
> of governing law is state or federal; (6) the adequacy of
> the state court action to protect the federal plaintiff's
> rights; (7) the relative progress of the state and
> federal proceedings; and (8) the presence or absence of
> concurrent jurisdiction.

PaineWebber, 276 F.3d at 206 (citing Romine, 160 F.3d at 340-31).

Applying those factors, this Court concludes that a stay is not

appropriate.

With regard to the first factor, no court has assumed

jurisdiction over any res or property. Contrary to ITEC's

contention that this factor is therefore irrelevant and does not go

into the calculation, the Sixth Circuit has indicated that where no

property is at issue, the factor "is inapposite . . . and thus

weighs against abstention." Romine, 160 F.3d at 341. Accord,

PaineWebber, 276 F.3d at 207.

Overall, this forum does not appear to be any less convenient

to the parties than the Illinois forum and hence the second factor

weighs in favor of retention. On the one hand, ITEC asserts that

it is headquartered in Illinois, Kile International does

substantial business with it in Illinois, and most of the witnesses

reside in Illinois. (Docket Entry No. 31 at 5). On the other

hand, Kile International is located in Nashville, witnesses reside

here, ITEC does substantial business in Tennessee, and ITEC retains

a license with the Tennessee Motor Vehicle Commission. (Docket

Entry No. 21 at 9). Where the geographical factor is neutral, that

factor favors retention of the case in federal court. Village of

Westfield v. Welch's, 170 F.3d 116, 122 (2d Cir. 1999).

10

ITEC's primary argument in favor of a stay relates to the third factor – the avoidance of piecemeal litigation. Its concern is that since the claims are based upon primarily the same substantive facts, "there would almost certainly be inconsistent legal or factual determinations." (Docket Entry No. 9 at 11).

Of course, any time two cases involving the same parties and based on similar facts are filed in different courts, there is the possibility of inconsistent determinations of either the facts or the law. However, there is no absolute bar against parallel proceedings in two or more courts since "'[e]ach court is free to proceed in its own way and in its own time without reference to the proceedings in the other court.'" Woodfern v. Community Action Agency, 239 F.3d 517, 525 (2d Cir. 2001)(quoting Kine v. Burke Construction Co., 260 U.S. 226, 230 (1922)). "'Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by an application of the principles of res adjudicata.'" Id. Accordingly, federal courts must "recognize the general rule that our dual system of federal and state governments allows parallel actions to proceed to judgment until one becomes preclusive of the other." Chase Brixton Health Serv's., Inc. v. Maryland, 411 F.3d 457, 462 (4th Cir. 2005).

The fact that adjudications in different courts "might end with 'disjointed or unreconcilable results . . . is not the threat of piecemeal litigation with which Colorado River was concerned; it is a prospect inherent in all concurrent litigation." Id. (citation omitted). "The 'mere potential for conflict in the

11

results of the adjudications does not, without more, warrant staying of federal jurisdiction'" and "thus is not sufficient to support a decision to abstain under <u>Colorado River</u>." <u>Id</u>. Accordingly, this factor does not weigh in favor of abstaining from jurisdiction in this case since, if issues are resolved in the other cases, they can be raised as a bar to the same claim in the present case.

The fourth factor deals with the order in which jurisdiction was obtained while the seventh factor deals with the relative progress of the cases. Here, the litigation in Illinois was filed some thirteen months before this case, while the option case was filed in this Court seven months before the instant case. "Were the test merely a race to the courthouse," these factors would favor abstention. <u>Caseros v. Younger</u>, 871 F.2d 305, 308 (2d Cir. 1989). "But the inquiry is not so simplistic; the relative progress of the federal and state proceedings must be carefully examined." <u>Id</u>.

Based upon the record as it presently exists, it appears that these two factors weigh in favor of a stay, although this is not altogether clear. According to the most recent report from ITEC, numerous depositions in the Illinois case were scheduled for November of this year and discovery was set to close on December 1, 2005. (Docket Entry No. 31 at 5). According to Kile International, by late September 2005, only one deposition had been taken, and there are numerous outstanding discovery disputes which make it unlikely that discovery would be completed by the court

12

imposed deadline. (O'Bryan Decl. ¶¶ 8-12). Discovery is set to close in this action on June 19, 2006, although the parties have agreed to utilize the discovery taken in the Illinois case in this case and supplement it where needed. (Docket Entry No. 26). Discovery in the option case in this Court is concluded, summary judgment has been denied, and trial is set for March 14, 2006. No trial has been set in the Illinois action, although the case management order provides that the case will be ready for trial by July 2006. (O'Bryan Decl. ¶ 12(c)). Given these facts, the Court concludes that both the Illinois case and the option case in this Court have progressed farther than this case and thus these factors weigh in favor of a stay.

The fifth factor is whether federal or state law supplies the rule of decision and the eighth factor relates to the presence or absence of concurrent jurisdiction. In this case, Kile International brings three claims, two under state law and one under the ADDCA, a federal statute. "Although in some rare cases the presence of state-law issues may weigh in favor of . . . surrender, the presence of federal law issues must always be a major consideration weighing against surrender" of federal jurisdiction in deference to parallel state proceedings. Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26 (1983). However, this factor is of less significance if the competing courts have concurrent jurisdiction. Id.

The Illinois court may have concurrent jurisdiction to entertain a claim under the ADDCA, see, Hugh Chalmers Motors v.

13

<u>Toyota Motor Sales U.S.A.</u>, 184 F.3d 761, 764 (8th Cir. 1999)(indicating there is no authority for proposition that federal court is exclusive forum for ADDCA claim), just as would this Court in the option case. At best, these factors appear to cancel each other out.

The last factor for consideration relates to the state court's ability to protect the rights of the Plaintiff. This factor weighs heavily in favor of this Court retaining jurisdiction. Tennessee law provides:

> Notwithstanding any other provision of law to the contrary, the venue for any cause of action, claim, lawsuit, arbitration, or mediation in which the parties or litigants are a manufacturer and a motor vehicle dealer shall be the state of Tennessee. This provision may not be waived in any contract or other agreement and to do so would be against the public policy of Tennessee.

T.C.A. § 55-17-115. The foregoing statute clearly provides that any claims between Tennessee manufacturers and motor vehicle dealers are to be litigated in Tennessee. Kile International would run the risk of violating state law were it to raise its present claims against ITEC in state court in Illinois.[1] This risk is not mere speculation given that the TMVC issued ITEC a letter of warning for filing its lawsuit in Illinois.

---

[1]Arguably, the claims could have been raised in the earlier-filed option case in this Court. However, that case was brought by the Kiles individually after ITEC refused to release its option. This case is brought by Kile International to address its differences with ITEC in relation to their Dealership Agreement. Moreover, the option case is presently set for trial in two months and the time for amending the pleadings, April 1, 2005 (Case No. 3:04-1069,Docket Entry No. 25), has long since passed.

14

After "a careful balancing of the important factors as they apply . . . with the balance heavily weighted in favor of the exercise of jurisdiction," <u>Moses H. Cone Memorial Hosp.</u>, 460 U.S. at 16, this Court finds that a stay is not appropriate. Many of the factors are neutral and hence favor retention. Moreover, one of Kile International's claims is grounded in federal law and the only Court which can presently hear *all* of Kile International's claims without potentially running afoul of Tennessee law is this Court.

"At bottom, in assessing whether <u>Colorado River</u> abstention is appropriate, a district court must remain mindful that this form of abstention 'is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'" <u>Chase Brexton</u>, 411 F.3d at 463 (quoting, <u>Colorado River</u>, 424 U.S. at 813). Assuming the pending actions between Kile International and ITEC are parallel, exceptional circumstances warranting abstention are not present in this case. Accordingly, ITEC's Motion to Stay will be denied.

**B.** **Motion to Dismiss**

**1.** **Automobile Dealer Day in Court Act Claim**

The ADDCA authorizes dealer suits against manufacturers to recover damages sustained by reason of the manufacturer's failure to act in good faith in performing the terms of the franchise. Good faith is defined in the statute as a duty "to act in a fair and equitable manner ... so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party[.]" 15 U.S.C. § 1221(e). This is "a quite

15

restrictive definition," <u>Overseas Motors, Inc. v. Import Motors Ltd., Inc.</u>, 519 F.2d 119, 124 (6th Cir. 1975), and, hence, "[i]n the absence of coercion, intimidation, or threats thereof, there can be no recovery through the [dealer] day-in-court statute." <u>Fray Chevrolet Sales, Inc. v. General Motors Corp.</u>, 536 F.3d 683, 685 (6th Cir. 1976). "Coercion must include 'a wrongful demand which will result in sanctions if not complied with.'" <u>Id</u>. (citations omitted). While insisting that the dealer comply with a reasonable obligation imposed by the franchise agreement does not constitute a wrongful demand, "[a] demand is wrongful if it pressures the dealer into taking an action it would not take otherwise, . . . or impels the dealer into forfeiting its rights under the dealer agreement[.]" <u>General Motors Corp. v. New A.C. Chevrolet, Inc.</u>, 263 F.3d 296, 326 (3d Cir. 2001).

In this case, ITEC argues Kile International cannot assert a cause of action under the ADDCA because ITEC did not make a "wrongful demand" upon Kile that would have resulted in sanctions if not complied with. However, a fair reading of the Complaint, coupled with the reasonable inferences which can be derived therefrom, suggests that Kile International can state a cause of action under the ADDCA.

Kile International claims that since 1999, ITEC has threatened termination of its franchise and has given pretextual reasons for doing so such as lack of proper facilities and Kile International's alleged inability to sell a sufficient number of parts. (Docket Entry No. 1 ¶ 9). Knowing that the TMVC would not find a reason for termination of the franchise, ITEC filed suit in an improper

16

foreign forum – the Illinois Circuit Court – and asked for an extortionate amount of money which has no basis in law or fact. (Id. ¶¶ 11, 12 & 17). Moreover, under the pretext that it would otherwise terminate the dealership, ITEC coerced the Kiles into building a multi-million dollar new facility and then refused to release the option on the old dealership site as promised causing them to lose a significant amount of money. (Id. ¶¶ 22-25). Such alleged actions, and others, suggest wrongful demands and a lack of good faith, even as that term is narrowly defined in the ADDCA.

ITEC insists that its filing of the Illinois action cannot be a "wrongful demand" because it is entitled to file suit to determine its rights. While this is true as a general proposition, "[t]he Dealers Day in Court Act contemplates a cause of action even upon the assertion of legal rights if there is a failure of good faith in the exercise thereof." York Chrysler-Plymouth v. Chrysler Credit Corp., 447 F.2d 786, 791 (5ᵗʰ Cir. 1971).

ITEC also claims that it has at all times acted in good faith and that it is doing nothing more than attempting to have Kile International abide by the Dealership Agreement. It is true that where a manufacturer has an objectively valid reason for acting in the way it did with regard to its dealer, the dealer cannot prevail under the ADDCA. Northview Motors, Inc. v. Chrysler Motors Corp., 277 F.3d 78, 93 (3d Cir. 2000). However, this presupposes that the manufacturer had no ulterior motive for its action. Id. "That is, a manufacturer's insistence that a dealer adhere to its franchise obligations can constitute a wrongful, sanction-based demand (and

17

thus the type of coercion or intimidation necessary to state an ADDCA violation), if the manufacturer's reliance on those obligations is motivated by a pretextual, bad-faith reason." <u>New AC Chevrolet</u>, 263 F.3d at 327.

The upshot of Kile International's claim is that ITEC has acted with an ulterior motive - to drive Kile International out or its dealership position and replace it with another dealer. "[A] manufacturer's efforts to drive a dealer out of business can qualify as bad faith." <u>Northview Motors</u>, 277 F.3d at 93. Moreover, evidence of improper motive may be sufficient to create a jury question in ADDCA actions. <u>Id</u>. at 94, <u>See also</u>, <u>Hall v. Ford Motor Co.</u>, 1995 WL 619972 at * 2 (6th Cir. 1995)(suggesting that where a jury could properly infer manufacturer was seeking to put dealership out of business, absence of good faith could be shown).

Given the embryonic stage of this litigation, the Court cannot decide, as a legal matter, that Kile International cannot prove a set of facts consistent with its Complaint that would entitle it to relief under the ADDCA. Accordingly, ITEC's motion to dismiss this claim will be denied.

### 2. **Illinois Motor Vehicle Franchise Act**

ITEC has moved to dismiss Kile International's claim under the IMVFA on the grounds that the Illinois statute does not apply to franchisees located outside the state of Illinois. Alternatively, ITEC asserts that the statute provides no private cause of action for damages for the fraud alleged.

18

The "Declaration of Purpose" for the act, as expressed by the Illinois legislature is as follows:

> 1.1. Declaration of purpose. The Legislature finds and declares that the distribution and sale of vehicles within this State vitally affects the general economy of the State and the public interest and welfare, and that in order to promote the public interest and welfare, and in the exercise of its police power, it is necessary to regulate motor vehicle manufacturers, distributors, wholesalers and factory or distributor branches or representatives, and to regulate dealers of motor vehicles doing business in this State in order to prevent frauds, impositions and other abuses upon its citizens, to protect and preserve the investments and properties of the citizens of this State, and to provide adequate and sufficient service to consumers generally.

815 ILCS § 710/1.1. The clear import of such language is that the statute is intended to apply to dealers selling vehicles within the State of Illinois and is meant to protect the citizenry of that state.

In this regard, the Sixth Circuit's decision in <u>BMW Stores Inc. v. Peugeot Motors of America, Inc.</u>, 860 F.2d 212 (6th Cir. 1988) is instructive. At issue was a Kentucky statute which permitted dealers to protest the granting of dealership franchises within ten miles of an existing dealer. Suit was brought under the statute by a Cincinnati, Ohio dealer after it learned that a competing dealer was setting up shop directly across the Ohio River in Newport, Kentucky.

The Sixth Circuit noted that the Kentucky legislature had not clearly expressed or indicated by its language or purpose that there was an intent for the statute to operate beyond Kentucky and therefore the statute was presumed to be intended to apply only in

19

Kentucky. <u>Id</u>. at 215 n.1. In fact, "the declared policy of [the statute] states that since the sale of motor vehicles '*within this state,* vitally affects the general economy *of the state*,*" the regulation of dealerships and distributors 'doing business in the state' is meant, in part, 'to protect and preserve the investments and properties of *the citizens of this state*.'" <u>Id</u>. at 215 (emphasis in original). <u>See also</u>, <u>Cromeens, Holloman, Sibert, Inc. v. AB Volvo</u>, 349 F.3d 371, 385 (7th Cir. 2003)(the Illinois Franchise Disclosure Act does not apply to out-of-state dealers); <u>Highway Equip. Co. v. Caterpillar, Inc.</u>, 908 F.2d 60, 62-64 (6th Cir. 1990)(holding Illinois Franchise Disclosure Act does not apply to suit by Ohio franchisee against Illinois franchiser, even though contract designated Illinois law as choice of law).[2]

Likewise in this case, the statute does not evidence any intent that it is to be applied extraterritorially and "[t]he Illinois Supreme Court has held that when a statute is silent as to its extraterritorial effect, there is a presumption that it has none." <u>H.R.R. Zimmerman Co. v. Tecumseh Co</u>., 2002 WL 31018302, at *3 (N.D. Ill. 2002) (citing <u>Wimmer v. Koenigseder</u>, 484 N.E.2d 1088,

---

[2]The Court has reviewed, but does not find persuasive, <u>Gainer Bank, N.A. v. Jenkins</u>, 672 N.E.2d 317, 320 (Ill. App. 1996) which is relied upon by Kile International for the proposition that the IMVFA should be given extraterritorial effect. That is an intermediate appellate court decision and is thus not controlling on Illinois state law. <u>See</u> <u>Unisource Worldwide, Inc. v. Carrara</u>, 244 F.Supp.2d 977, 982 fn. 2 (C.D. Ill. 2003)(federal court not bound by an Illinois appellate court decision). More importantly, the court in <u>Gainer</u> was dealing with the Illinois Motor Vehicle Retail Installment Sales Act and its comment in a parenthetical that the IMVFA could have an extraterritorial effect is dictum.

1091-92 (Ill. 1985)).  Quite the contrary, the Declaration of Purpose speaks in terms of the distribution and sale of vehicles in Illinois, the public interest and welfare of Illinois residents, the regulation of dealers doing business in Illinois, and the preservation of property and investments of Illinois citizens.  See Fireside Chrysler-Plymouth Mazda, Inc. v. Chrysler Corp., 129 Ill. App. 3d 575, 583 (Ill. App. 1984)(emphasis added)(to "promote the public interest and welfare, and protect consumers generally, the Act must apply . . . to any person who engages, directly or indirectly, in business dealings with respect to motor vehicle franchises *within the state*").

Other provisions of the statute also suggest that it is intended only to apply to Illinois.  For example, in several sections, the statute contains different provisions depending upon whether the county has "300,000 persons" or more, see e.g., 815 ILCS 710/2(q); 815 ILCS 710/4(e)(8)(C), and many Illinois statutes make distinction based upon whether a county has 300,000 or more residents, see e.g., 20 ILCS 655/5; 35 ILCS 200/3-40; 55 ILCS 5/1-5001.  Additionally, in two different places, the statute provides for remedies and in both instances states that the remedies are to be sought "in the circuit court of the county in which the objecting franchisee has its principal place of business."  810 ILCS 710/12(e) & 710/13.[3]  Undoubtedly "circuit court" relates to

---

[3]In response to ITEC's argument that Plaintiff cannot maintain a claim for damages, Kile International quotes 810 ILCA 710/13, yet inexplicably ends the quotation with ellipses right before the language which states that claims shall be filed "in the circuit

21

Illinois circuit courts since some states do not have "circuit courts."

This Court's review of the IMVFA as a whole leads it to conclude that the IMVFA only applies to the relationship between Illinois manufacturers and dealers. Accordingly, ITEC's motion to dismiss Kile International's IMVFA claim will be granted.

### 3. Breach of Contract Claim

Kile International alleges that ITEC breached the Dealership Agreement by:

> 1. Failing to evaluate Kile International's performance by comparison to similarly situated dealers, nearby in geography and in terms of the products and services offered by the dealer;
>
> 2. Failing to provide reports to Kile International setting out how its performance may be improved;
>
> 3. Failing to evaluate Kile International's performance under the Dealership Agreement based upon the unique equities facing the dealership in its area of responsibility;
>
> 4. Wrongfully declaring Kile International in breach of the Dealership Agreement;
>
> 5. Excluding Kile International from programs offered to other dealers; and
>
> 6. Failing to provide Kile International with the necessary support to obtain a reasonable market share.

(Docket Entry No. 1 ¶¶ 73, 74, 76).

In broad strokes, ITEC seeks dismissal of Kile International's breach of contract claim. While it might be true that the

---

court of the county in which the objecting franchisee has its principal place of business[.]" This is an important provision of the statute.

22

Dealership Agreement does not obligate ITEC to provide the necessary support to obtain a reasonable market share, or to include Kile International in programs offered to other dealers, the Dealership Agreement does provide that ITEC would compare Kile International's market share and penetration with other similarly situated dealers and that ITEC would "consider any factors relevant to the Dealer's performance . . . so that while the dominant tests are to be objective ones, equities of the Dealer shall temper the results of such tests." (Dealership Agreement ¶ 16). Additionally, the Dealership Agreement provides that in order to maintain a satisfactory level of performance, ITEC would review with the dealer the extent to which it has obtained satisfactory performance and operating requirements and provide a written report to the dealer for its study. (Id. ¶ 6).

Kile International also alleges that "ITEC has breached the franchise agreement by failing to act in good faith and to deal fairly with Kile with respect to the performance of the contract." (Docket Entry No. 1 ¶ 75). "Under Tennessee law, every contract carries with it an implied covenant of good faith and fair dealing." Goot v. Metropolitan Gov't of Davidson County, 2005 WL 3031638 at *7 (Tenn. Ct. App. 2005) (citing Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 686 (Tenn. 1996); Elliott v. Elliott, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004)). "As a result of this covenant, each contracting party promises to perform its part of the contract in good faith and, in return, expects the other party to do the same." Id. Kile International's allegations are that

23

ITEC breached this implied covenant in various ways, all with the ultimate goal of wrongfully forcing it out of business. The Court recognizes ITEC's argument that "performance of a contract according to its terms cannot be characterized as bad faith." (Docket Entry No. 31 at 12). This argument, however, presupposes that ITEC met its implied obligation to act in good faith. "Parties to a contract are bound 'to act in word and deed, in a responsible manner.'" <u>Dunn v. Matrix Exhibits, Inc.</u>, 2005 WL 2604048 at *3 (Tenn. Ct. App. 2005). Accordingly, dismissal of the breach of contract claim is not warranted.

## IV. <u>CONCLUSION</u>

On the basis of the foregoing, ITEC's "Motion to Dismiss or Stay" (Docket Entry Nos. 8 & 12) will be granted in part and denied in part. The Motion for Stay will be denied. The Motion to Dismiss will be granted with respect to Kile International's claim under the IMVFA, but in all other respects denied.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

24